

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GLORIA LUCIANO,

      Plaintiff,

-against-

OFFICER ANGEL MENDEZ, et al.,

      Defendants.

**Case No.: 7:25-cv-06731-CS**

GLORIA LUCIANO,

      Plaintiff,

-against-

CHIEF JOHN HANK, GARNET HEALTH MEDICAL CENTER, et al.,

      Defendants.

**Case No.: 26-cv-02083**

*The motion to consolidate is denied. While there might be some factual overlap between the two cases, it is dwarfed by the facts do not overlap. Moreover, at this stage Plaintiff's allegations that both cases arise from a continuing course of unconstitutional conduct is conclusory. Further, while I express no view on the extent to which facts underlying one case may be admissible in the other, consolidation does not make sense at this stage, given the radically different procedural postures of the two cases. Discovery is already under way in 25-CV-6731, whereas the Defendants in 26-CV-2083 have not even been served yet, and some may well move to dismiss. The Clerk is respectfully directed to docket this Order in both of the captioned cases and to terminate ECF No. 6 in No 26-CV-2083 and ECF No. 22 in No. 25-CV-6731.*

*SO ORDERED.*

*CATHY SEIBEL, U.S.D.J.*    *4/6/26*

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO CONSOLIDATE RELATED ACTIONS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 42(a)

### PRELIMINARY STATEMENT

Plaintiff Gloria Luciano respectfully submits this memorandum of law in support of her motion to consolidate the above-captioned actions pursuant to Federal Rule of Civil Procedure 42(a). Both actions arise from a continuous, documented pattern of unconstitutional conduct by officers of the Town of Montgomery Police Department against Plaintiff premised on her disability or perceived disability. The September 12, 2023 incident — in which officers compelled Plaintiff's involuntary psychiatric hospitalization at Garnet Health Medical Center — and the August 18, 2024 incident — in which officers entered Plaintiff's home without a warrant,

used excessive force, compelled Plaintiff's involuntary psychiatric hospitalization at Garnet Health Medical Center, and initiated retaliatory criminal charges against her — are not independent events.

Consolidation is warranted because both actions share common questions of law and fact, involve substantially overlapping defendants, arise from a continuous course of government misconduct, and involve evidence that is inextricably intertwined. Consolidation will serve judicial economy, avoid inconsistent judgments, and eliminate the burden of duplicative discovery. Because both cases are at early stages, consolidation will cause no prejudice to any party.

## FACTUAL BACKGROUND

### A. Case No. 7:25-cv-06731-CS: The August 18, 2024 Incident

On August 18, 2024, officers of the Town of Montgomery Police Department — including Officers Mendez, Whelan, Gallagher, and Mahoney — responded to Plaintiff's residence during her court-ordered parenting time. Despite observing no signs of danger and lacking a warrant, the officers entered Plaintiff's home, subjected her to excessive force, compelled her involuntary psychiatric transport to Garnet Hospital, and subsequently caused retaliatory felony charges to be filed against her. Those charges were later dismissed with no admission of guilt. Plaintiff asserts violations of the First, Fourth, Ninth and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act, and 42 U.S.C. § 1983.

**B. Case No. 26-cv-02083: The September 12, 2023 Incident**

On September 12, 2023, officers of the Town of Montgomery Police Department — including Officer Whelan, Chief John Hank, and Sergeant Robert McNeely — responded to a 911 call placed by Helen Otero, Plaintiff's mother, making disability-based allegations about Plaintiff. Despite Plaintiff presenting as coherent, communicative, and non-threatening, officers compelled her involuntary psychiatric transport to Garnet Health Medical Center, where she was held against her will. During Plaintiff's involuntary hospitalization, Helen Otero obtained custody of Plaintiff's children — custody she did not previously hold. Plaintiff alleges that the physicians and mental health workers at Garnet Health Medical Center who evaluated and admitted her failed to conduct an independent, individualized assessment and instead relied on disability or perceived disability status to justify the unlawful commitment. Plaintiff asserts violations of the First, Fourth, Ninth and Fourteenth Amendments, the ADA, the Rehabilitation Act, and the New York Mental Hygiene Law, among other claims.

**C. The Connection Between the Two Actions**

The original complaint filed in Case No. 7:25-cv-06731-CS specifically references prior encounters with the same officers that predate August 18, 2024. The September 12, 2023 incident is not merely background — it is the event that established the department's awareness of Plaintiff's disability and directly enabled Otero to obtain emergency custody of Plaintiff's children, creating the very custody arrangement whose disruption is at the heart of the August 2024 claims. Officer Whelan is a named defendant in both actions. Chief Hank, whose personal involvement in the September 2023 commitment is central to Case No. 26-cv-02083, is also relevant to the Monell municipal liability theory in Case No. 7:25-cv-06731-CS. The same 911

caller(s), the same disability-based pretext, and Garnet Health Medical Center appear in both cases.

## LEGAL STANDARD

Federal Rule of Civil Procedure 42(a) provides that when actions before a court "involve a common question of law or fact," the court may "consolidate the actions." Fed. R. Civ. P. 42(a)(2). The decision to consolidate is committed to the sound discretion of the district court. Johnson v. Celotex Corp., 899 F.2d 1281, 1284 (2d Cir. 1990). In exercising that discretion, courts weigh "the interest of judicial convenience against the potential for delay, confusion, and prejudice." Id.

Consolidation is particularly appropriate where actions share common parties, arise from a common nucleus of operative facts, and involve substantially overlapping legal theories. See Devlin v. Transportation Commc'ns Int'l Union, 175 F.3d 121, 130 (2d Cir. 1999). The Second Circuit has recognized that consolidation serves the interests of justice by eliminating duplicative litigation, reducing costs, avoiding inconsistent results, and preserving judicial resources. Johnson, 899 F.2d at 1285.

Courts in this District routinely consolidate civil rights actions arising from a common course of conduct even where the cases involve some distinct defendants, provided the overlapping facts and legal issues predominate. See MacAlister v. Guterma, 263 F.2d 65, 68 (2d Cir. 1958) (consolidation appropriate where common issues of fact and law exist and efficiency is served).

## ARGUMENT

## I. THE TWO ACTIONS SHARE COMMON QUESTIONS OF LAW AND FACT.

Rule 42(a) requires only that the actions "involve a common question of law or fact." The threshold is readily met here. Both actions arise from the Town of Montgomery Police Department and its officers' repeated, documented practice of responding to disability-based 911 calls involving Plaintiff and subjecting her to involuntary mental health intervention without individualized assessment and without legitimate legal justification after obtaining knowledge of plaintiff's disability and/or perceived disability.

The common questions of law include but are not limited to: (1) Whether all defendants acted under the color of law?; (2) Whether Defendants deprived Plaintiff of her constitutional or other federal rights, including but not limited to those secured by the First, Fourth, Ninth, and Fourteenth Amendments. (3) Was the deprivation of Plaintiff's liberty reasonable? (4) Did the defendants act with deliberate indifference or reckless disregard? (5) Did the defendants' actions or inaction cause harm to the plaintiff? (6) Did the defendants act jointly or in concert? (7) whether Chief John Hank's personal involvement in the September 12, 2023 commitment establishes municipal liability under Pembaur v. City of Cincinnati, 475 U.S. 469 (1986);

The common questions of fact include but not limited to: (1) the nature and extent of Plaintiff's disability and the defendants' awareness of it; (2) the policies and practices of the Defendents' governing mental wellness responses; (3) the standards and procedures of Defendents' acting under Mental Hygiene law; and (4) the chain of causation linking the September 2023 to the August 2024 events.

## II. THE FOURTEENTH AMENDMENT CLAIMS IN BOTH ACTIONS ARE LEGALLY AND FACTUALLY INSEPARABLE.

First, The Fourteenth Amendment claims in both actions are not merely related — they are legally and factually inseparable. Separating these cases would require two courts to adjudicate the same constitutional rights under the Fourteenth Amendment arising from the same continuous government conduct.

Second, both actions raise identical Equal Protection claims under the Fourteenth Amendment. In both cases, Plaintiff alleges that government actors operating under state-delegated authority — treated her disability or perceived disability as a per se basis for detention without conducting any individualized assessment of actual dangerousness. The Equal Protection standard applicable to disability-based government action is the same legal question in both cases, and the factual record underlying that question is substantially shared.

Third, the malicious prosecution claim under the Fourteenth Amendment in Case No. 7:25-cv-06731-CS requires proof that Officer Gallagher acted with actual malice when signing the felony complaint against Plaintiff following the August 2024 incident. A central element of that actual malice showing is what The Town of Montgomery Police Dept and its officers' knew about Plaintiff from prior encounters. Separating the two cases would force the court adjudicating the malicious prosecution claim to evaluate evidence that properly belongs in the other case.

Fourth, both actions raise the same procedural due process question under the Fourteenth Amendment: what process is constitutionally required before a person is involuntarily committed under MHL 9.41? This legal question must be resolved consistently across both cases because the September 2023 and August 2024 commitments involved the same statutory framework, the

same police department, and the same receiving facility. Inconsistent rulings on this question in two separate proceedings would create irreconcilable precedent governing the same defendants' conduct.

## III. THE ACTIONS ARISE FROM A SINGLE CONTINUOUS COURSE OF CONDUCT.

Consolidation is especially compelling where, as here, the two actions are not merely factually related but are part of a continuous course of government conduct. The September 12, 2023 incident was the first documented instance of the Town of Montgomery Police Department invoking Plaintiff's disability or perceived disability as a basis for involuntary psychiatric intervention. That incident established the department's awareness of Plaintiff's disability and, as a direct consequence of the unlawful hospitalization, enabled Otero to obtain temporary custody of Plaintiff's children during Plaintiff's incapacitation.

The original complaint in Case No. 7:25-cv-06731-CS expressly references prior police encounters as part of the pattern supporting Plaintiff's claims in that action. The September 2023 incident is thus already part of the factual record in Case No. 7:25-cv-06731-CS. Keeping these actions separate would require both courts to hear substantially overlapping testimony, review substantially overlapping documentary evidence, and evaluate substantially overlapping legal arguments about the same defendants' toward the same plaintiff over the same period.

## IV. OVERLAPPING DEFENDANTS AND WITNESSES MAKE CONSOLIDATION EFFICIENT.

Officer Megan Whelan is a named defendant in both actions. Chief John Hank is named in Case No. 26-cv-02083 and is a critical witness to the Monell pattern alleged in Case No. 7:25-cv-06731-CS by virtue of his personal presence at the September 2023 forced commitment.

Helen Otero is a key fact witness in both actions. Garnet Health Medical Center appears in both actions — as a defendant in Case No. 26-cv-02083 and as the facility to which Plaintiff was transported on August 18, 2024 in Case No. 7:25-cv-06731-CS.

Without consolidation, the same witnesses will be deposed twice, the same documents produced twice, and the same expert opinions, offered in two separate proceedings. Consolidation eliminates this duplication and serves the interests of all parties, including defendants.

## V. CONSOLIDATION WILL AVOID THE RISK OF INCONSISTENT JUDGMENTS.

Perhaps most importantly, allowing these two actions to proceed separately creates a substantial risk of inconsistent findings on overlapping factual and legal questions.

Consolidation eliminates this risk by ensuring that all related claims are adjudicated together by a single judicial officer with full knowledge of the complete factual record.

## VI. CONSOLIDATION WILL NOT CAUSE PREJUDICE OR UNDUE DELAY.

Both actions are at early stages. Case No. 7:25-cv-06731-CS is still in discovery. Case No. 26-cv-02083 was filed in March 2026. The additional defendants in Case No. 26-cv-02083 — the Garnet Health Medical Center physicians and mobile mental health workers — raise distinct claims that can be efficiently managed within a consolidated proceeding. Courts in this District regularly consolidate civil rights actions involving overlapping governmental and private defendants where the core factual and legal questions predominate over the differences. The presence of additional defendants in one action does not preclude consolidation where, as here, the common issues are substantial and dispositive.

## CONCLUSION

For the foregoing reasons, Plaintiff Gloria Luciano respectfully requests that this Court consolidate Case No. 7:25-cv-06731-CS and Case No. 26-cv-02083 pursuant to Federal Rule of Civil Procedure 42(a) for all purposes, including discovery and trial. In the alternative, Plaintiff requests that the Court designate the cases as related and assign them to the same judicial officer to ensure coordinated management of the overlapping factual and legal issues.

Respectfully submitted,

Gloria Luciano, Pro Se Plaintiff
202 St. Andrews Road, Apt. 1
Walden, New York 12586
Telephone: (845) 636-0622
Email: gloriaciano4@gmail.com

Date: 4/2/26

# EXHIBIT A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

GLORIA LUCIANO

      Plaintiff,

  -against-

THE TOWN OF MONTGOMERY                  Civil File Nos.: 25CV6731/

OFFICER ANGEL MENDEZ, Shield #58                 26CV02083

OFFICER MICHAEL GALLAGHER, Shield #25     **JURY TRIAL DEMANDED**

OFFICER MEGAN WHELAN, Shield #24

OFFICER MATHEW MAHONEY, Shield #40

CHIEF JOHN HANKS, SGT. ROBERT MCNEELY

MICHELLE DOE #1, MICHELLE DOE #2,

GARNET HEALTH MEDICAL CENTER,

DR. MOATAZ HAGGAG, DR. MATTHEW MEIGH,

RESIDENT NICOLE FERNANDEZ,

RESIDENT EMMANUEL ILORI, DR. RAKHMATULLINA,

DR. OLANREWAJU, DR. FAROOQI, DR. MAGINLEY,

AND DR. SHIVASHANKAR

      Defendants.

## PLAINTIFF'S FIRST AMENDED CONSOLIDATED COMPLAINT

### JURISDICTION AND VENUE

1. Jurisdiction is conferred on this Court under 28 U.S. 1331 and 1343(a)(3) and (4).

2. This Court also have supplemental jurisdiction under 28 U.S.C. 1367 to hear Plaintiff's state law claims.

3. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in the Town of Montgomery, Orange County, New York, which is located within this District.

## PARTIES

1. Plaintiff GLORIA LUCIANO ("Plaintiff") is a resident of the State of New York, residing at 202 St. Andrews Road, Apt. 1, Walden, New York 12586, in Orange County.

2. Defendant OFFICER ANGEL MENDEZ (Shield #58) is and was at all relevant times a police officer employed by the Town of Montgomery Police Department, located at 110 Bracken Road, Montgomery, New York 12549. He is sued in both his individual and official capacities.

3. Defendant OFFICER MEGAN WHELAN (Shield #24) is and was at all relevant times a police officer employed by the Town of Montgomery Police Department, located at 110 Bracken Road, Montgomery, New York 12549. She is sued in both her individual and official capacities.

4. Defendant OFFICER MICHAEL GALLAGHER (Shield #25) is and was at all relevant times a police officer employed by the Town of Montgomery Police Department, located at 110 Bracken Road, Montgomery, New York 12549. He is sued in both individual and official capacities.

5. Defendant OFFICER MATTHEW MAHONEY (Shield #40) is and was at all relevant times a police officer employed by the Town of Montgomery Police Department, located at 110 Bracken Road, Montgomery, New York 12549. He is sued in both his individual and official capacities.

6. Defendant TOWN OF MONTGOMERY is a municipal corporation duly organized and existing under the laws of the State of New York. The Town of Montgomery maintains and operates the Town of Montgomery Police Department and is responsible for the policies, customs, practices, supervision, and training of its police officers. Located at 110 Bracken Road, Montgomery, New York 12549

7. CHIEF JOHN HANKS, is and was at all relevant times the chief officer of the Town of Montgomery Police employed by the Town of Montgomery Police Department, located at 110 Bracken Road, Montgomery, New York 12549. He is sued in both his individual and official capacities.

8. SGT. ROBERT MCNEELY, is and was at all relevant times a Sargeant with the Town of Montgomery Police employed by the Town of Montgomery Police Department, located at 110 Bracken Road, Montgomery, New York 12549. He is sued in both his individual and official capacities.

9. MICHELLE DOE #1 & MICHELLE DOE #2, C/O ORANGE COUNTY MOBILE MENTAL HEALTH CRISIS TEAM,

10. GARNET HEALTH MEDICAL CENTER, hospital where involuntary psychiatric evaluation was conducted, located at 707 E Main St. Middletown, New York 10940.

11. DR. MOATAZ HAGGAG, employed during all relevant times with GARNET HEALTH MEDICAL CENTER, 707 E Main St. Middletown, New York 10940.

12. DR. MATTHEW MEIGH, employed during all relevant times with GARNET HEALTH MEDICAL CENTER, 707 E Main St. Middletown, New York 10940.

13. RESIDENT NICOLE FERNANDEZ, employed during all relevant times with GARNET HEALTH MEDICAL CENTER, 707 E Main St. Middletown, New York 10940.

14. RESIDENT EMMANUEL ILORI, employed during all relevant times with GARNET HEALTH MEDICAL CENTER, 707 E Main St. Middletown, New York 10940.

15. DR. RAKHMATULLINA, employed during all relevant times with GARNET HEALTH MEDICAL CENTER,  707 E Main St. Middletown, New York 10940.

16. DR. OLANREWAJU, employed during all relevant times with GARNET HEALTH MEDICAL CENTER,  707 E Main St. Middletown, New York 10940.

17. DR. FAROOQI, employed during all relevant times with GARNET HEALTH MEDICAL CENTER, 707 E Main St. Middletown, New York 10940.

18.  DR. MAGINLEY, employed during all relevant times with GARNET HEALTH MEDICAL CENTER, 707 E Main St. Middletown, New York 10940.

19. DR. SHIVASHANKAR, employed during all relevant times with GARNET HEALTH MEDICAL CENTER,  707 E Main St. Middletown, New York 10940.

## FACTUAL ALLEGATIONS

### *A.  The Pattern of Targeting Plaintiff Based on Her Disability: Town of Montgomery, The Town of Montgomery Police Dept., and Defendant officers'*

1. Plaintiff, Gloria Luciano, has a disability and/or was perceived as having a disability by Defendants at all times relevant to this action.

2. Prior to Defendants acquiring notice of Plaintiff's disability or perceived disability, the Town of Montgomery Police Department responded to isolated civilian complaints involving Plaintiff without incident, arrest, or mental health intervention.

3. On **February 4, 2023**, Officer **Whelan** responded to Plaintiff's residence following a complaint that Plaintiff's dog was chained outside and barking too much. Officer Whelan requested that Plaintiff bring the dog inside, which Plaintiff agreed to do. The scene was cleared without further action or contact.

4. On **April 24, 2023**, Sergeant **Robert McNeely** responded to a complaint placed by Plaintiff's neighbor, **Jennifer Stafford**, alleging screaming and banging outside Plaintiff's residence for approximately twenty minutes. Plaintiff spoke with Sergeant McNeely. The scene was cleared and no arrests or further police action were taken.

5. On September 12, 2023, at about 11 am, two women from the Mobile Mental Health Crisis team identified themselves as **Michelle** Doe #1 and **Michelle** Doe #2, came to my home, 202 St. Andrews Rd. Apt.1 Walden, NY 12586

6. **Michelle** Doe #1 and #2 stated my mother, Helen Otero, called claiming I was suicidal. I stated I was not and this was a result of a disagreement. They left my property.

7. At approximately 1pm, Chief of Police, **John Hanks**, stopped me on Berea Rd. and stated "my family was worried about me and called…"

8. In disbelief of the sincerity of the concerns, I ask Mr. Hanks questions about the person and information given.

9. I tried my best to communicate the events leading to these phone calls to Mr. Hanks, considering this was the second call and detainment in which I was subjected to

questioning within two hours. He asked me to wait with him until Mobile Mental Health Crisis team members arrived. So, I waited patiently.

10. PO Whelen and SGT. MCNEELY arrived on the scene before Mobile Mental Health Crisis team members.

11. I greeted the officers and, during our conversation, recognized that I had previously encountered SGT. MCNEELY involving an incident with an upstairs tenant at 202 St. Andrews Rd. Walden, New York. We spoke briefly about that event.

12. Mobile Mental Health Crisis team members Michelle Doe #1 and Michelle Doe #2 arrived after about five minutes. This time stating they were told I was hearing voices.

13. Again, I asserted this was not true and that I have no voices telling me to do anything and do not have thoughts of hurting myself or anyone else.

14. In conversation I was open about my medical history without shame and at this point I was told it was necessary I be detained.

15. At the time of the September 12, 2023 encounter, Plaintiff was coherent, communicative, calm, and posed no threat to herself or others. Despite this, Defendants (Chief Hanks, SGT. MCNEELY, OFFICER WHELAN, MICHELLE DOE #1 AND #2) compelled Plaintiff to undergo an involuntary mental health evaluation (MHL 9.41/9.58) based solely on the caller's allegations regarding Plaintiff's disability and/or perceived mental health status.

16. When I pleaded with the officers to not allow such constitutional infringement I was told in sum and substance, they were not "here" to make any observations or input but to transport me to the hospital.

17. Defendants' Michelle Doe #1 and Michelle Doe #2 violated MHL 9.58 by directing Plaintiff's removal without evidence that Plaintiff was conducting herself in a manner likely to result in "serious harm."

18. Defendants' CHIEF HANKS, SGT. MCNEELY, AND OFFICER WHELAN had an affirmative duty to intervene to prevent the unlawful seizure of Plaintiff. Despite a clear lack of evidence that Plaintiff posed a "serious harm," as required by MHL 9.58/9.41, Defendants' failed to intercede and instead provided the state- authorized force necessary to effectuate the illegal detention, thereby violating Plaintiff's rights under the Fourth and Fourteenth Amendments.

19. As a result of the September 12, 2023 incident, the Town of Montgomery Police Department acquired actual and constructive notice of Plaintiff's disability and/or perceived disability.

20. I recorded the entire encounter and possess the original file. However, when the officers were putting me behind their police car, I no longer had the right to record. I will produce the video in Discovery. **See Exhibit 1.**

## B. *GARNET HEALTH MEDICAL CENTER — INVOLUNTARY EVALUATION AND PSYCHIATRIC COMMITMENT – CONTINUATION OF DISABILITY AND/OR PERCEIVED DISABILITY DISCRIMINATION:*

21. When I arrived at Garnet Health Medical Center, I patiently waited to be assessed. The assessment was conducted by Resident Nicole Fernandez. She asked me background questions, which I answered. I repeatedly asserted that I was not experiencing suicidal ideation and was not thinking about harming myself or anyone else as I told the Defendant officers' and Mobile Mental Health Crisis team.

22. I explicitly requested that the 911 caller/my mother not be contacted, as I had no reason to believe she would be honest about the events that transpired throughout the day.

23. Dr. Meigh, interviewed me after Resident Fernandez for about three minutes. There was another patient making a scene, so it was disruptive to the room as that patient required extra help. However, in that short interview I asserted I was not suicidal, hearing voices, or looking to harm anyone.

24. Resident Fernandez also reported to Dr. Moataz Haggag. Dr Moataz Haggag stated on my medical records "I was directly involved in the management and decision making of this patient with the resident on 9/12/23. I have reviewed the documentation above and agree with A/P." This statement was made in bad faith as he introduced himself but did not perform an evaluation.

25. Ultimately, I was held involuntarily at Garnet Health Medical Center. Defendants': Garnet Health Medical Center, Dr. Moataz Haggag, Dr. Matthew Meigh, Resident Nicole Fernandez, Resident Emmanuel Ilori, Dr. Rakhmatullina, Dr. Olanrewaju, Dr. Farooqi, Dr. Maginley, and Dr. Shivashankar violated MHL 9.39/9.40/9.01 by failing to conduct a meaningful, fair, and independent clinical evaluation.

26. Despite Plaintiff's non-violent and cooperative conduct within the Emergency Room and Behavioral Unit Defendants' relied on a "collateral" phone conversation with my mother and my disability status and/or perceived disability status to justify restrictive inpatient admission, failing to meet the "likelihood of serious harm" evidentiary standard required for a deprivation of liberty.

27. At this point, distress set in. I had children to return too and a home to take care of. Despite my patience and cooperation I was held against my will.

28. As a result of being involuntarily hospitalized, I was subjected to conditions that were degrading, humiliating, and stripped me of basic autonomy.

   a. My personal belongings including my phone, bookbag, books, laptop etc. – were taken from me, leaving me completely unable to contact anyone.

   b. I was required to remove my own clothing and change into a hospital gown, which was humiliating and stripped me of my personal dignity.

   c. I was not permitted to use normal silverware and instead was treated as if I posed a danger despite repeatedly stating I was not suicidal or harmful to anyone.

   d. I was forced to remove my shoes due to the laces and walk without shoes, further reinforcing the degrading assumption that I was a threat.

   e. I was prevented from returning home to care for my children and perform normal daily responsibilities such as preparing dinner for them.

   f. Most significantly, because the hospital detained me under false pretenses, I was prevented from appearing in court for matters concerning the custody of my children, causing direct and severe harm to my parental rights.

29. Resident Ilori was the main resident I spoke with on the behavioral unit and doctors Rakhmatullina and Olanrewaju saw me for a moment that added to about one minute yet continue to support my inpatient status.

30. Dr. Farooqi was the psychiatrist assigned to me when I was inpatient and he distorted things I said regarding bible scriptures and faith in God into a mental health illness and used it to say I was hearing voices and/or seeing things.

31. After a week Dr. Maginley was the psychiatrist assigned to me and he continued to support the dialogue that was set forth by the practitioners before him.

32. I was repeatedly asked the same questions as to whether I felt like hurting myself or anyone and as to whether I saw things that were not there – I repeatedly responded with the same answer "no."

33. At some point I stated I no longer want to answer these condescending questions, it was annoying and my answer was not changing, and it served no legitimate purpose. I recalled Resident Ilori even using this as a basis to call me "hostile" and/or "suspicious."

34. Toward the end of my stay I spoke with Dr. Shivashankar, looked her in the eye, and repeated what I had said since the beginning of the events – I did not see or hear things, nor did I want to hurt myself or anyone.

35. Throughout my stay it became clear there was a systemic issue in Garnet Health Medical Center. Doctors were not applying statue and/or practicing good professional conduct and/or applying principles recognized in the American Medical Association and/or respecting the patient Bill of Rights and setting poor examples to the doctors and staff below them.

36. Furthermore, the conditions of my confinement were demeaning and dehumanizing. The sheets in my room smelled of urine. When I spoke to a nurse named "McKayla" about the condition of the sheets, she responded with indifference. Additionally, I was served

visibly rotten fruit. The fact that a hospital food service worker considered it appropriate to serve food in such condition was extremely disturbing.

37. Moreover, Garnet Health Medical Center rules and/or policy stated that attending group sessions would help facilitate discharge, however, in practice, the only action that resulted in my discharge was agreeing to take the prescribed medication. At one point, Dr. Maginley stated that if I chose to receive the medication by injection, I could be released even sooner.

38. Finally, I was discharged from Garnet Health Medical Center on the 6th Day of October 2023.

## C. The Pattern of Targeting Plaintiff Based on Her Disability Continued: Town of Montgomery, The Town of Montgomery Police Dept., and Defendant officers':

39. On **October 14, 2023**, Officer **Gallagher** responded to Plaintiff's property following additional calls placed by Helen Otero making substantially similar allegations to those raised on **September 12, 2023**. Gallagher appeared on scene with different members of the Mobile Mental Health Crisis team. Gallagher's colleague Officer Alvarado kept his foot in-between Plaintiff's doorstep when Plaintiff opened the door and refused to allow Plaintiff to close her door when she declined services. Ultimately, the Mobile Mental Health Crisis team members on scene accepted Plaintiff's statement that she was not in crisis, and all parties left Plaintiff's property

40. From approximately **September 2023 through December 2024**, the Town of Montgomery Police Department repeatedly responded to Plaintiff's home based on allegations related to Plaintiff's mental health, children, and/or dog. During this period,

Defendants escalated their responses by employing additional measures not used in earlier encounters.

41. The marked shift in Defendants' treatment of Plaintiff after September 12, 2023 - following their awareness of Plaintiff's disability and/or perceived disability - demonstrates a pattern, practice, and/or custom of treating Plaintiff's disability and/or perceived disability as inherently dangerous and using that perception as a basis for heightened intervention.

### D. The August 18, 2024 Incident

1. On August 18, 2024, at approximately 3 p.m., Officers Mendez, Whelan, Gallagher, and Mahoney responded to Plaintiff's residence at 202 St. Andrews Road, Walden, New York 12586, in response to a 911 call made by two previous callers - Helen Otero and Jennifer Stafford.

2. At the time of the officers' arrival, Plaintiff was engaged in her court-ordered parenting time with her children and was in the process of de-escalating her son's bad behavior through lawful, non-physical parental discipline.

3. Plaintiff communicated with the officers through her closed front door, informing them there was no emergency, that they did not have permission to enter her home, and that she would address them once she had de-escalated her son.

4. Plaintiff's window blinds were open, providing the officers with a clear and unobstructed view into the interior of her home. Officer Gallagher expressly acknowledged on his bodycam footage that he had a clear view of the inside, observed no signs of violence, harm, or danger inside the residence.

5. Despite observing no exigent circumstances and lacking a warrant, the officers entered Plaintiff's home without her consent. The claimed exigent circumstances justification was pretextual and is directly contradicted by the officers' own contemporaneous observations documented on bodycam footage.

6. Upon entering, the officers informed Plaintiff she was "being detained" but refused to provide any basis for the detention when Plaintiff asked.

7. The forced entry caused Plaintiff's dog to run out of the home toward the road. As Plaintiff moved toward her porch steps to secure her dog, Officer Gallagher wrapped his right hand behind Plaintiff's back and used his left hand to grab her left arm. Officer Whelan simultaneously grabbed Plaintiff's other arm. Officer Gallagher then pushed Plaintiff toward Officer Whelan as she continued pulling, causing Plaintiff to fall forward toward Whelan

8. Officer Whelan hooked her right arm around Plaintiff's neck while Officer Gallagher, using both hands on Plaintiff's back, forced her body forward. Officers Mendez and Mahoney simultaneously grabbed Plaintiff's left arm and hand, forcing her body toward the ground despite plaintiff's lack of aggression.

9. At no point during this sequence did Plaintiff act violent, resist the officers, or pose any threat to the officers or any other person.

10. During the course of the takedown, while Plaintiff was being forced to the ground and physically restrained, Officer Mendez stated, "Fuck you" and "There'll be no more fucking walking," and then deliberately and maliciously twisted Plaintiff's right ankle beyond its natural range of motion in the opposite direction for an extended period of

time, evidencing a deliberate intent to cause injury and inflict pain beyond any legitimate law enforcement purpose. **See Exhibit 2**

11. Plaintiff repeatedly asked the officers what they were doing and requested to be allowed to stand up and secure her dog. These requests were ignored.

12. Plaintiff's minor children were present and witnessed the officers' physical takedown of their mother.

13. The officers refused to review video footage Plaintiff had taken prior to their arrival that would have directly disproven any allegation of a crime.

14. The officers permitted unauthorized individuals into Plaintiff's home and turned over Plaintiff's personal property to Helen Otero without Plaintiff's consent.

15. Following the incident, the officers compelled Plaintiff to be transported to a psychiatric hospital for an involuntary mental health evaluation. Plaintiff was coherent, communicative, and not violent. Her children were uninjured and required no emergency medical services. Plaintiff was released from the hospital the same day, on August 18, 2024, as Plaintiff had been participating in mental health treatment since October 2023.

16. No mobile mental health crisis team services were used by defendant officers' during this incident.

### E. The Retaliatory Felony Charges

1. On August 19, 2024 Plaintiff submitted a FOIL request to Police Clerk of Records, Marissa Rugnetta, for officers BODYCAM footage.

2. Plaintiff received the following quoted response on August 20, 2024 in regard to FOIL request – " Please be advised that documents are unable to be released until completed

by the assigned Police Officer and approved by a Sergeant. This process could take 7-10 business days, depending on the officers' schedules."

3. On August 30, 2024, Officer Gallagher signed a felony complaint against Plaintiff in the Town Court of Montgomery, County of Orange, State of New York, charging Plaintiff with: (1) Assault 2nd Degree (PL 120.05(3)); (2) Obstruct Governmental Administration 2nd Degree (PL 195.05); (3) Criminal Obstruction of Breathing or Blood Circulation (PL 121.11(A)); and (4) Acting in a Manner Injurious to a Child Under 17 (PL 260.10(1)).

4. On September 9, 2024 Plaintiff followed up with the Police Clerk of Record about FOIL request at which time she was informed of a warrant being issued for her arrest. Plaintiff turned herself into the Montgomery Police Department promptly for processing.

5. These charges were filed notwithstanding that: (a) the children did not require medical attention on August 18, 2024; (b) Helen Otero, declined to cooperate or file a police report; (c) Officer Gallagher's own bodycam footage documented the absence of any dangerous or threatening conduct by Plaintiff; and (d) Plaintiff's conduct throughout the encounter was not violent.

6. As of March 2026, all charges against Plaintiff were dismissed. Plaintiff made no admission of guilt as part of the settlement. The underlying charges were not proven. The prosecution terminated without a conviction, satisfying the favorable termination element for malicious prosecution. Thompson v. Clark, 596 U.S. 36 (2022).

7. The filing of these felony charges was done with actual malice and without probable cause as no reasonable officer could conclude, based on the facts available at the time, that Plaintiff was committing a crime.

*F. The False Child Protective Services Report and Its Consequences*

1. Officer Gallagher filed a report with child protective services concerning Plaintiff. In connection with that report, he falsely characterized Plaintiff as "erratic, irate, and incoherent" during the August 18, 2024 encounter. Documents provided in discovery.

2. The characterization of Plaintiff as "erratic, irate, and incoherent" was materially false. Bodycam footage from August 18, 2024 encounter documents Plaintiff's actual conduct throughout the incident. Plaintiff was coherent, communicative, and not violent. The officer's false characterization was made knowingly and without factual basis.

3. As a result of the false CPS report, Plaintiff was indicated by child protective services. An indicated CPS finding carries serious legal consequences, including its use as evidence in family court proceedings affecting custody and visitation. Plaintiff is currently appealing the indicated CPS finding causing direct and measurable harm to Plaintiff's reputation as a parent and person.

## FIRST CAUSE OF ACTION

### Discrimination based on disability or perceived disability

### Title II of the American with Disabilities Act

### 42 U.S.C 12131, et seq.

*(Against all Defendants')*

1. Plaintiff realledge and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

2. Title II of the Americans with Disabilities Act states "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

3. Defendants' denied the benefits of services, programs, and/or activities to which plaintiff is entitled too including but not limited to the right to be free of discriminatory or disparate treatment by virtue of plaintiff's mental disability or perceived mental disability. As a result, Plaintiff suffered harm in violation of plaintiff's rights under ADA 42 U.S.C 12132.

## SECOND CAUSE OF ACTION

**Violation of Title III of the ADA, 42 U.S.C. 12181, et seq.,**

**And Section 504 of the Rehabilitation Act, 29 U.S.C. 794**

*(Against all Defendants')*

1. Plaintiff realledge and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

2. Under 42 U.S.C. 12182, Defendants' are prohibited from discriminating against an individual on the basis of disability in the full and equal enjoyment of privileges, advantages, services or accommodations.

3. Under 29 U.S.C. 794 Defendants may not exclude or discriminate against a qualified individual solely by reason of their disability. Defendants' acted with deliberate indifference to Plaintiff's federally protected rights, resulting in discriminatory disparate

treatment and harm to the Plaintiff. As a result of Defendants' discriminatory acts, Plaintiff has been harmed and is entitled to damaged including but not limited to injunctive and compensatory damages.

## THIRD CAUSE OF ACTION

### Unlawful Seizures in Violation of the Fourth and Fourteenth Amendments

### *(Against all Defendants')*

1. Plaintiff realledge and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

2. Pursuant to the express language 42 U.S.C. 1983, liability extends to "Every person who, under color of any statue… subjects a citizen to a deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

3. All Defendants' were acting "under the color of statue" – specifically New York Mental Hygiene Law 9.39, 9.40, 9.41, and/or 9.58. These statues granted the Defendants legal authority to bypass Plaintiff's lack of informed consent, and/or forcibly seize her, and/or forcibly transport her, and/or forcibly evaluate her; a power they would not possess as mere private citizens and/or private physicians' with no prior physician-patient relationship.

4. All Defendants' seizure of Plaintiff was unreasonable, without probable cause, and done without lawful justification.

## FOURTH CAUSE OF ACTION

### Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments

*(Against The Town of Montgomery, OFFICER ANGEL MENDEZ, Shield #58*

*OFFICER MICHAEL GALLAGHER, Shield #25, OFFICER MEGAN WHELAN, Shield #24*
*OFFICER MATHEW MAHONEY, Shield #40)*

1. Plaintiff realledge and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

2. A government official who knowingly provides false information that is used to initiate legal proceedings against an individual violates that individual's Fourth and Fourteenth Amendment due process rights.

3. On or about August 24, 2024, Officer Mendez obtained a police report from Jennifer Stafford while she was hospitalized for unknown reasons, under the influence of medication and narcotics. Additionally, he knew or should have known that she was providing information not stated on the day of the incident and/or exaggerated and/or with malice toward Plaintiff.

4. Defendants' acted with deliberate indifference to Plaintiff's federally protected rights, resulting in discriminatory disparate treatment and harm to the Plaintiff.

5. Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, as their actions violated both the law and/or their own rules of practice and/or their own policy manuals and/or basic principles of good ethics and morale.

## FIFTH  CAUSE OF ACTION

### Interference with Parental Rights in Violation of the Fourteenth Amendment

*(All Defendents')*

1. Plaintiff realledge and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

2. On September 12, 2023 Plaintiff told Defendants' Michelle Doe #1 and #2, Chief John Hanks, Officer Whelan, Sgt. McNeely, Garnet Medical Health Center and its physicians' that she had to return home to care for her children and all named defendants participated in Plaintiff's inability to return home and care for her children by the unlawful seizure of plaintiff and plaintiff's personal property.

3. On September 4, 2024, Officer Gallagher provided materially false information to child protective services by characterizing Plaintiff as "erratic, irate, and incoherent," and a danger to her children during the August 18, 2024 encounter.

4. Plaintiff retains a constitutionally protected liberty interest in raising her children including but not limited to the right to exercise reasonable and lawful discipline, free from unwarranted government interference.

5. The children's moral and emotional wellbeing was directly and adversely affected by witnessing officers use force against Plaintiff while she was engaged in the lawful, non-physical correction of her son's behavior during court-ordered parenting time.

6. Defendants' Town of Montgomery and Defendant Officers' interfered with Plaintiff's fundamental parental rights through a series of interconnected unlawful acts including but not limited to: (a) entering her home and using force against her during court-ordered parenting time; and/or (b) removing her from her children's presence through an unjustified involuntary psychiatric commitment; and/or (c) initiating felony charges that resulted in a court-ordered stay away order restricting Plaintiff's parental relationship; and/or (d) filing a false CPS report that resulted in an indicated finding currently being used against Plaintiff in family court.

7. The harm to Plaintiff's parental rights is not speculative - it is concrete, documented, and ongoing.

8. Defendants' acted with deliberate indifference to Plaintiff's federally protected rights, resulting in discriminatory disparate treatment and harm to the Plaintiff.

9. Furthermore, all Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, as their actions violated both the law and/or their own rules of practice and/or their own policy manuals and/or basic principles of good ethics and morale.

## SIXTH CAUSE OF ACTION

### The First Amendment (Free Exercise Clause)

(Against all Defendants')

1. Plaintiff realledge and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

2. Defendants' Garnet Health Medical Center and Michelle Doe #1 and #2 used Plaintiff's expression of faith as a diagnostic indicator of mental illness. When Plaintiff stated her belief in God, the Mobile Mental Health crisis team immediately pivoted to interrogating Plaintiff's medical history, treating a protected religious belief as a clinical symptom rather than fundamental right.

3. Garnet Health Medical Center and its physicians treated Plaintiff's religious creed and disability and/or perceived disability history as proxies for "serious harm" providing care that was inferior and disparate when compared to a person without such a creed and/or disability.

4. Defendants' Town of Montgomery/Town of Montgomery Police Dept. officers' retaliated against Plaintiff for exercise of her protected speech through a coordinated series of adverse actions including but not limited to: (a) forcibly entering her home; (b) using excessive force against her; (c) compelling her involuntary psychiatric commitment; (d) causing felony charges to be filed against her without probable cause; and (e) filing or causing to be filed a false CPS report characterizing Plaintiff as "erratic, irate, and incoherent," and as a danger to her children.

## SEVENTH CAUSE OF ACTION

**Violation of the New York State Human Rights Law (NYSHRL), Executive Law 296(2)**

*(Against Garnet Health Medical Center, Dr. Moataz Haggag, Dr. Matthew Meigh, Resident Nicole Fernandez, Resident Emmanuel Ilori, Dr. Rakhmatullina, Dr. Olanrewaju, Dr. Farooqi, Dr. Maginley, and Dr. Shivasshankar)*

1. Plaintiff realledge and incorporate by reference the allegations set forth in the forgoing paragraphs as if fully set forth herein.

2. At all times relevant, Defendant Garnet Health Medical Center was a "place of public accommodation" as defined by NY Executive Law 292(9) , and the Defendant Physicians were agents or employees thereof.

3. Under NY Executive Law 296(2)(a), it is an unlawful discriminatory practice for any person, being the owner, agent or employee of any place of public accommodation, to refuse, withhold from, or deny any person the full and equal enjoyment of any accommodations, advantages, facilities, or privileges because of disability or creed.

4. Defendants' discriminated against Plaintiff on the basis of disability or perceived disability by denying her an independent, objective medical assessment. Instead of evaluating Plaintiff's current non-violent conduct, Defendants' relied on Plaintiff's disability and/or perceived disability status to justify restrictive involuntary hospitalization.

5. Defendants' further discriminated against Plaintiff on the basis of creed by using her religion as a symptom of mental health illness.

6. Garnet Health Medical Center and its physicians treated Plaintiff's religious creed and disability and/or perceived disability history as proxies for "serious harm" providing care that was inferior and disparate when compared to a person without such a creed and/or disability.

## EIGTH CAUSE OF ACTION

## FAILURE TO INTERVENE

### (Against all Defendents')

1. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

2. Each Defendant who was present during the warrantless entry, and/or unlawful detention, and/or use of excessive force, and/or initiation of malicious criminal charges, and/or initiation of malicious child abuse/maltreatment report, and/or involuntary psychiatric commitment and/or involuntary psychiatric evaluation and/or seizure of plaintiff's personal property had a realistic opportunity to intervene to prevent the constitutional violations committed by the other Defendants.

3. Each Defendant failed to intervene despite having the opportunity to do so, rendering each individually liable for all constitutional violations that occurred.

## NINTH CAUSE OF ACTION

## MONELL CLAIM: MUNICIPAL LIABILITY

*(Against the Town of Montgomery)*

1. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

2. A municipality is liable under 42 U.S.C. § 1983 where a plaintiff's constitutional deprivation was caused by a policy, custom, or practice of the municipality, or by a failure to train amounting to deliberate indifference to constitutional rights. Monell v. Dep't of Social Services, 436 U.S. 658 (1978).

3. The Town of Montgomery, through its Police Department, maintained policies, customs, and practices that directly caused Plaintiff's constitutional injuries, including, but not limited to: (a) a practice and/or custom of responding to mental wellness calls by compelling involuntary psychiatric evaluations without an individualized assessment of actual dangerousness; (b) a practice and/or custom of disregarding individuals' protected rights; (c) a failure to follow protocols regarding individuals with a disability and/or perceived disability; (d) a failure to train officers in the appropriate handling of individuals with mental health disabilities.

4. The Town of Montgomery had actual or constructive notice of this pattern through encounters involving the chief, same officers, same caller(s), and the same pretextual justifications, and failed to take any corrective action, demonstrating deliberate indifference to Plaintiff's constitutional rights.

## TENTH CAUSE OF ACTION

## MEDICAL MALPRACTICE

*(Against Garnet Health Medical Center, Dr. Moataz Haggag, Dr. Matthew Meigh, Resident Nicole Fernandez, Resident Emmanuel Ilori, Dr. Rakhmatullina, Dr. Olanrewaju, Dr. Farooqi, Dr. Maginley, and Dr. Shivasshankar)*

1. Plaintiff realledge and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

2. At all times relevant, Defendants held themselves out as medical professionals capable of providing psychiatric evaluations and care, and owed a duty of care to Plaintiff to act in accordance with the accepted standards of medical practice.

3. The standard of care for involuntary psychiatric hospitalization in New York is strictly governed by the Mental Hygiene Law 9.01/9.39/9.40, which requires a current "likelihood of serious harm" based on objective conduct, threats, and violent behavior.

4. Defendants breached the standard of care by failing to conduct a fair, competent, independent, equal, and individualized clinical assessment of Plaintiff's current medical state.

5. Defendants deviated from the standard of care by relying on non-clinical factors, including Plaintiff's disability and/or perceived disability status and religious creed to justify a restrictive inpatient admission.

6. Defendants' conduct was willful, malicious, oppressive, and/or reckless , as observations and dialogue was distorted in order to justify Plaintiff's involuntary detention.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests:

1. Compensatory and punitive damages in an amount to be determined at trial as fair and reasonable;

2. Reasonable attorney's fees, expert witness fees, and litigation costs pursuant to 42 U.S.C. 1988 and other applicable laws; and

3. Such other and further legal or equitable relief as the Court deems just and proper in the interests of justice.

Dated: Walden, New York

April 01, 2026

By:

GLORIA LUCIANO, *PRO SE*

PLAINTIFF

202 St. Andrews Road

Apt. 1

Walden, New York 12586

(845) 636-0622

Glorialuciano4@gmail.com

TO: JUDITH B. AUMAND, ESQ.

Bar Roll No.: 515936

Attorneys for Defendants

7 Washington Square

P.O. Box 15085

Albany, New York 12212-5085

Printed: 06/26/2025 0954

## TOWN OF MONTGOMERY PD
## 110 BRACKEN ROAD
## MONTGOMERY, NY 12549

Page: 1

Exhibit 1

| Entry/CC#: TM-005896-23 | Date: 09/12/2023 | Time: 1243 | Tour: B |
|---|---|---|---|

| Call Type: EDP | | Priority: | How Received: TELEPHONE |
|---|---|---|---|

**Caller:** OTERO, HELEN

**Caller Address:** ███████████

**Caller Phone Number:** ██████

**Location Name:**

**Location Address:** 202 St Andrews Rd 2, WALDEN NEW YORK 12586

**Cross Street:**

**Description:** MRT assistance

**Disposition:** SUBJECT ARRESTED

**Post:**  Dispatch Date:  09/12/2023    Dispatch Time: 1243

**Call Taker:**    Call Taker Supervisor:

--- PERSONS INVOLVED ---

**Name:** LUCIANO, GLORIA

**Role:** Arrest Subject

**Date of Birth:** ██████

**Sex:** F

**Race:** ████

**Address:** ████████████

**Phone Number:** ███████    Phone Type:    Cell

**Name:** OTERO, HELEN

**Role:** Caller

**Date of Birth:** ██████

**Sex:** F

**Race:** ████

**Address:** ████████████

**Phone Number:** ██████    Phone Type:    Cell

--- PERSONNEL INVOLVED ---

**Name:** THORSON, DANIEL

**Serial #:** 1008    Rank: DET

**Officer Role:** B

**Name:** MEEHAN, JASON

**Serial #:** 1010    Rank: LT

**Officer Role:** B

Scanned with
CamScanner

Printed: 06/26/2023 0954      **TOWN OF MONTGOMERY PD**      Page: 2
**110 BRACKEN ROAD**
**MONTGOMERY, NY 12549**

Exhibit 1

Name: WHELAN, MEGAN
Serial #: 1206      Rank: PO
Officer Role: AO
Name: LOPARRINO, NICHOLAS
Serial #:      Rank: PO
Officer Role: B
Name: MCNEELY, ROBERT
Serial #: 1013      Rank: SGT
Officer Role: SP
Name: HANK, JOHN
Serial #: 1009      Rank: CHF
Officer Role: CHIEF

---

## UNITS INVOLVED

| Unit: 251 | Agency: 1 | Officers: THORSON, MEEHAN | |
|---|---|---|---|
| Dispatched: | Acknowledged: | Arrived: 1326 | Completed: 1327 |
| Dispatch to Completion: | | Received to Completion: | |

| Unit: 268 | Agency: 1 | Officers: WHELAN | |
|---|---|---|---|
| Dispatched: 1244 | Acknowledged: 1244 | Arrived: 1255 | Completed: 1347 |
| Dispatch to Completion: 63 minutes | | Received to Completion: 1 minutes | |

| Unit: 261 | Agency: 1 | Officers: LOPARRINO | |
|---|---|---|---|
| Dispatched: 1244 | Acknowledged: 1244 | Arrived: 1237 | Completed: 1330 |
| Dispatch to Completion: 46 minutes | | Received to Completion: 1 minutes | |

| Unit: 266 | Agency: 1 | Officers: MCNEELY | |
|---|---|---|---|
| Dispatched: | Acknowledged: | Arrived: 1223 | Completed: 1434 |
| Dispatch to Completion: | | Received to Completion: | |

| Unit: 250 | Agency: 1 | Officers: HANK | |
|---|---|---|---|
| Dispatched: | Acknowledged: | Arrived: 1321 | Completed: 1347 |
| Dispatch to Completion: | | Received to Completion: | |

---

## NARRATIVES


Scanned with
CamScanner

Printed: 06/26/2025 0954    **TOWN OF MONTGOMERY PD**
**110 BRACKEN ROAD**
**MONTGOMERY, NY 12549**    Page: 3

Exhibit 1

09/12/2023 12:41 -- VANDENDOOREN, CAITLIN (1109) -- MMH transferred caller ▓▓▓▓▓▓▓ stating concerned for her daughter but poor connection and was unable to get info besides good call back number of ▓▓▓▓▓▓▓, no answer on call back

09/12/2023 12:43 -- VANDENDOOREN, CAITLIN (1109) -- Base contacted OC crisis center and spoke with Maxine which provided the location and stated that MRT was out at location earlier and had cleared the female and then mom called back stating she had become more erratic and said she was on a mission and was going to do what the voices told her.

09/12/2023 12:58 -- VANDENDOOREN, CAITLIN (1109) -- No answer at the door

09/12/2023 13:05 -- VANDENDOOREN, CAITLIN (1109) -- Base made contact with the original call who stated that when she was located earlier she was walking on Plains Rd in a Blk shirt large brown bag. Female is a 30 YOF tan skin tone, about 5'5 with blond hair and brown roots. Units canvassing area

09/12/2023 13:21 -- VANDENDOOREN, CAITLIN (1109) --Unit 250 possibly has female walking Berea/Coleman

09/12/2023 13:21 -- VANDENDOOREN, CAITLIN (1109) --Unit 250 out with female in above listed location. MRT updated

09/12/2023 13:26 -- VANDENDOOREN, CAITLIN (1109) --Unit 268,261 and 251 out with 100

09/12/2023 13:45 -- VANDENDOOREN, CAITLIN (1109) -- Unit 250 advising 1 female in custody 945, MRT working out transport order

09/12/2023 13:47 -- VANDENDOOREN, CAITLIN (1109) --Unit 268 transporting female to station
SM// 37095

09/12/2023 13:51 -- VANDENDOOREN, CAITLIN (1109) -- Shield 118 in unit 268 to garnet
SM// 37097

09/12/2023 14:07 -- VANDENDOOREN, CAITLIN (1109) -- Unit out at Garnet
BM// 37109

09/12/2023 14:34 -- VANDENDOOREN, CAITLIN (1109) --Unit clear

Scanned with
CS CamScanner

Exhibit 1

**TOWN OF MONTGOMERY PD**
**110 BRACKEN ROAD**
**MONTGOMERY, NY 12549**

Page: 4

09/12/2023 18:17 — WHELAN, MEGAN (1206) — See Case File for Details

───────────────── **RELATED RECORDS** ─────────────────

Arrest          TM-00108-23
Case            TM-00320-23

Scanned with
CS CamScanner

Exhibit 1

Printed: 06/26/2025

## CASE REPORT

Page 1

### TOWN OF MONTGOMERY PD

CASE REPORT #: TM-00320-23

Blotter/CC #: TM-005896-23

### MAIN CASE INFORMATION

UCR Case Status :

Status Date:

Dept Case Status :

Report Date: 09/12/2023          Time: 12:43          Report Day: Tue

| Occurred On/From: | Day Tue | Date 09 12 2023 | Time 12:43 | Occurred On/To: | Day Tue | Date 09 12 2023 | Time 12:43 | Incident Type EDP | |
|---|---|---|---|---|---|---|---|---|---|
| Incident Address (Street No., Street Name, Bldg. No., Apt. No.) 202 St Andrews Rd | | | | City, State, Zip (☐C☐T☐V ) WALDEN, NY 12586 | | | | Location Code 3661 | |
| Business Name | | Inquiries (Check all that apply) ☐DMV ☐Want/Warrant ☐Scofflaw ☐Crim. History ☐Stolen Property ☐Other | | | | | NYSPIN Message No. | Notified/TOT | |

### OFFICERS INVOLVED

| Serial # | Rank | Name | Type/Role Shield | Command | Squad |
|---|---|---|---|---|---|
| 1008 | DBT | DANIEL THORSON | 1008 | TMPD | SQUAD A |
| 1010 | LT | JASON MEEHAN | 1010 | TMPD | |
| 1206 | PO | MEGAN WHELAN | 1206 | | |
| | PO | NICHOLAS LOPARRINO | | | |
| 1013 | SGT | ROBERT MCNEELY | 1013 | TMPD | |
| 1009 | CHF | JOHN HANK | 1009 | TMPD | |

### PERSONS INVOLVED

| Name: GLORIA LUCIANO | | | Role: Arrest Subject |
|---|---|---|---|
| Address: ██████████ | | | |
| Apt No.: █ | Bus Phone: | Sex: F | DOB: ████ |
| Phone: | Mobile Phone: ████ | Age: ● | Race: ████ |

| Name: HELEN OTERO | | | Role: Caller |
|---|---|---|---|
| Address: ██████████ | | | |
| Apt No.: | Bus Phone: | Sex: F | DOB: ████ |
| Phone: | Mobile Phone: ████ | Age: ● | Race: ████ |

### NARRATIVES

Title:

09/12/2023 12:41 -- VANDENDOOREN, CAITLIN (1109) -- MMH transferred caller ████ stating concerned for her daughter but poor connection and was unable to get info besides good call back number of ████ ██ no answer on call back

09/12/2023 12:43 -- VANDENDOOREN, CAITLIN (1109) -- Base contacted OC crisis center and spoke with Maxine which provided the location and stated that MRT was out at location earlier and had cleared the female and then mom called back stating she had become more erratic and said she was on a mission and was going to do what the voices



Exhibit 1

told her.

09/12/2023 12:58 – VANDENDOOREN, CAITLIN (1109) – No answer at the door

09/12/2023 13:05 – VANDENDOOREN, CAITLIN (1109) – Base made contact with the original call who stated that when she was located earlier she was walking on Plains Rd in a Blk shirt large brown bag. Female is a 30 YOF tan skin tone, about 5'5 with blond hair and brown roots. Units canvasing area

09/12/2023 13:21 – VANDENDOOREN, CAITLIN (1109) –Unit 250 possibly has female walking Berea/Coleman

09/12/2023 13:21 – VANDENDOOREN, CAITLIN (1109) –Unit 250 out with female in above listed location. MRT updated

09/12/2023 13:26 – VANDENDOOREN, CAITLIN (1109) –Unit 268,261 and 251 out with 100

09/12/2023 13:45 – VANDENDOOREN, CAITLIN (1109) – Unit 250 advising 1 female in custody 945, MRT working out transport order

09/12/2023 13:47 – VANDENDOOREN, CAITLIN (1109) –Unit 268 transporting female to station
SM// 37095

09/12/2023 13:51 – VANDENDOOREN, CAITLIN (1109) – Shield 118 in unit 268 to garnet
SM// 37097

09/12/2023 14:07 – VANDENDOOREN, CAITLIN (1109) – Unit out at Garnet
EM// 37109

09/12/2023 14:34 – VANDENDOOREN, CAITLIN (1109) –Unit clear

Title:
09/12/2023 18:17 – WHELAN, MEGAN (1206) – See Case File for Details

Title:
09/12/2023 19:02 – WHELAN, MEGAN (1206) – Patrol responded to the above location at the request of Mobil Mental Health. Upon arrival to the residence it was determined that Gloria Luciano (04/19/1993) was no longer at that location. Patrol was notified by TMPD Dispatch that she had mad contact with Gloria's mother via phone who had stated that Gloria had back a brown book bag with a box cutter, stated that she was "on a mission" and left her residence on foot. Patrol canvased the area. Gloria was location on Berea Rd where Mobil Mental Health arrived and evaluated her. Gloria was taken into custody for MHL 9.41.


Scanned with
CS CamScanner

Exhibit #



Exhibit



Scanned with
CamScanner

**NOTICE OF STATUS AND RIGHTS**
**EMERGENCY ADMISSION**
(to be given to the patient at the time of admission to the hospital)

Section 9.39 Mental Hygiene Law

Patient's Name (Last, First, M.I.)
Luciano, Gloria M
Sex FDOB 4/13/1093 30 y.o.
CMRN:714173 DOS:9/12/23
Time 2:09 PM
CSN: 30220483   MRN: 714173



Facility Name                    Unit/Ward Residence No.

Date of arrival at hospital  9 | 12 | 23

**TO:** Gloria Luciano

Based upon an examination by a staff physician, you have been admitted as an emergency-status patient to this hospital for persons with mental illness because you are alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate. It also alleged that such mental illness is likely to result in serious harm, which according to Section 9.01 of the Mental Hygiene Law means "(a) a substantial risk of physical harm to the person as manifested by threats of, or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm." Within 48 hours of the time of your admission, you will be examined by another physician, who is a member of the psychiatric staff of the hospital. If he or she confirms the first physician's findings, you may then be kept in the hospital for a period of up to 15 days from the date of your arrival. During this 15 day period you may be released, converted to involuntary status, or asked to remain as a voluntary or informal patient.

You, and anyone acting on your behalf, should feel free to ask hospital staff about your condition, your status and rights under the Mental Hygiene Law, and the rules and regulations of this hospital.

If you, or those acting on your behalf, believe that you do not need immediate observation, care and treatment, you or they may make a written request for a court hearing that will take place as soon as possible, and, in any event, within 5 days after the request is recieved by the hospital. Copies of such a request will be forwarded by the hospital director to the appropriate court and the Mental Hygiene Legal Service.

### MENTAL HYGIENE LEGAL SERVICE

The Mental Hygiene Legal Service, a court agency independent of this hospital, can provide you and your family with protective legal services, advice and assistance, including representation, with regard to your hospitalization. You are entitled to be informed of your rights regarding hospitalization and treatment, and have a right to a court hearing, to be represented by a lawyer, and to seek independent medical opinion.

You, or someone acting on your behalf, may see or communicate with a representative of the Mental Hygiene Legal Service by telephoning or writing directly to the office of the Service or by requesting hospital staff to make such arrangements for you.

The Mental Hygiene Legal Service representative for this hospital may be reached at:

**MENTAL HYGIENE LEGAL SERVICES**
**ORANGE COUNTY OFFICE**
**5 COATES DRIVE, SUITE 4**
**GOSHEN, NY 10924**
**TEL: 845-476-3672**

THE ABOVE PATIENT HAS BEEN GIVEN A COPY OF THIS NOTICE.

9/13/23

Signature of Staff Physician                    Date

COPIES TO: Persons designated by patient to be informed of admission.

A copy of this Notice of Status and Rights is also being sent to the Mental Hygiene Legal Service.
State and Federal Laws prohibit discrimination based on race, color, creed, national origin, age, sex, or disability.

Scanned with
CamScanner


Scanned with
CamScanner





# EXHIBIT B

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

GLORIA LUCIANO

        Plaintiff,

  -against-

THE TOWN OF MONTGOMERY

OFFICER MENDEZ, Shield #58

OFFICER GALLAGHER, Shield #25

OFFICER WHELAN, Shield #24

OFFICER MAHONEY, Shield #40

        Defendants.

Civil File No.: 25CV6731

**JURY TRIAL DEMANDED**

## PLAINTIFF'S FIRST AMENDED COMPLAINT

### JURISDICTION AND VENUE

1. This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), as this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, the ADA, and the Rehabilitation Act.

2. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in Orange County, New York, which is located within this District.

### PARTIES

1. Plaintiff GLORIA LUCIANO ("Plaintiff") is a resident of the State of New York, residing at 202 St. Andrews Road, Apt. 1, Walden, New York 12586, in Orange County.

2. Defendant OFFICER ANGEL MENDEZ (Shield #58) is and was at all relevant times a police officer employed by the Town of Montgomery Police Department, located at 110 Bracken Road, Montgomery, New York 12549. He is sued in both his individual and official capacities.

3. Defendant OFFICER MEGAN WHELAN (Shield #24) is and was at all relevant times a police officer employed by the Town of Montgomery Police Department. She is sued in both her individual and official capacities.

4. Defendant OFFICER MICHAEL GALLAGHER (Shield #25) is and was at all relevant times a police officer employed by the Town of Montgomery Police Department. He is sued in both individual and official capacities.

5. Defendant OFFICER MATTHEW MAHONEY (Shield #40) is and was at all relevant times a police officer employed by the Town of Montgomery Police Department. He is sued in both his individual and official capacities.

6. Defendant TOWN OF MONTGOMERY is a municipal corporation duly organized and existing under the laws of the State of New York. The Town of Montgomery maintains and operates the Town of Montgomery Police Department and is responsible for the policies, customs, practices, supervision, and training of its police officers.

## FACTUAL ALLEGATIONS

### A. The Pattern of Targeting Plaintiff Based on Her Disability

1. Plaintiff, Gloria Luciano, has a disability and/or was regarded as having a disability by Defendants at all times relevant to this action.

2. Prior to Defendants acquiring notice of Plaintiff's disability or perceived disability, the Town of Montgomery Police Department responded to isolated civilian complaints involving Plaintiff without incident, arrest, or mental health intervention.

3. On **February 4, 2023**, Officer **Whelan** responded to Plaintiff's residence following a complaint that Plaintiff's dog was chained outside and barking. Officer Whelan requested that Plaintiff bring the dog inside, which Plaintiff agreed to do. The scene was cleared without further action or contact.

4. On **April 24, 2023**, Sergeant **Robert McNeely** responded to a complaint placed by Plaintiff's neighbor, **Jennifer Stafford**, alleging screaming and banging outside Plaintiff's residence for approximately twenty minutes. Plaintiff spoke with Sergeant McNeely. The scene was cleared and no arrests or further police action were taken.

5. On **September 12, 2023**, Officer **Whelan**, Chief of Police, **John Hanks**, and Sergeant **Robert McNeely** responded to a 911 call placed by **Helen Otero**, Plaintiff's mother, who made allegations regarding Plaintiff's mental health and disability or perceived disability.

6. At the time of the September 12, 2023 encounter, Plaintiff was coherent, communicative, calm, and posed no threat to herself or others. Despite this, Defendants compelled Plaintiff to undergo an involuntary mental health evaluation (MHL 9.41) based solely on the caller's allegations regarding Plaintiff's disability and/or perceived disability/mental health status. This incident is the subject of a pending action within the Southern District. Plaintiff has this encounter on video.

7. As a result of the September 12, 2023 incident, the Town of Montgomery Police Department acquired actual and constructive notice of Plaintiff's disability and/or perceived disability.

8. On **October 14, 2023**, Officer **Gallagher** responded to Plaintiff's property following additional calls placed by Helen Otero making substantially similar allegations to those raised on **September 12, 2023**. Gallagher appeared on scene with Mobile Mental Health Crisis team. Officer Gallgher's colleague, Officer Alvarado, kept his foot in-between Plaintiff's doorstep when Plaintiff opened the door and refused to allow Plaintiff to close her door when she declined services. Ultimately, the Mobile Mental Health Crisis team members on scene accepted Plaintiff's statement that she was not in crisis, and all parties left Plaintiff's property.

9. From approximately **September 2023 through December 2024**, the Town of Montgomery Police Department repeatedly responded to Plaintiff's home based on allegations related to Plaintiff's mental health, children, and/or dog. During this period, Defendants escalated their responses by employing additional measures not used in earlier encounters.

10. The marked shift in Defendants' treatment of Plaintiff after September 12, 2023 - following their awareness of Plaintiff's disability and/or perceived disability - demonstrates a pattern, practice, and/or custom of treating Plaintiff's disability and/or perceived disability as inherently dangerous and using that perception as a basis for heightened intervention.

### A. The August 18, 2024 Incident

1. On August 18, 2024, at approximately 3 p.m., Officers Mendez, Whelan, Gallagher, and Mahoney responded to Plaintiff's residence at 202 St. Andrews Road, Walden, New York 12586, in response to a 911 call made by two previous callers - Helen Otero and Jennifer Stafford.

2. At the time of the officers' arrival, Plaintiff was engaged in her court-ordered parenting time with her children and was in the process of de-escalating her son's bad behavior through lawful, non-physical parental discipline.

3. Plaintiff communicated with the officers through her closed front door, informing them there was no emergency, that they did not have permission to enter her home, and that she would address them once she had de-escalated her son.

4. Plaintiff's window blinds were open, providing the officers with a clear and unobstructed view into the interior of her home. Officer Gallagher expressly acknowledged on his bodycam footage that he had a clear view of the inside, observed no signs of violence, harm, or danger inside the residence.

5. Despite observing no exigent circumstances and lacking a warrant, the officers entered Plaintiff's home without her consent. The claimed exigent circumstances justification was pretextual and is directly contradicted by the officers' own contemporaneous observations documented on bodycam footage.

6. Upon entering, the officers informed Plaintiff she was "being detained" but refused to provide any basis for the detention when Plaintiff asked.

7. The forced entry caused Plaintiff's dog to run out of the home toward the road. As Plaintiff moved toward her porch steps to secure her dog, Officer Gallagher wrapped his

right hand behind Plaintiff's back and used his left hand to grab her left arm. Officer Whelan simultaneously grabbed Plaintiff's other arm. Officer Gallagher then pushed Plaintiff toward Officer Whelan as she continued pulling, causing Plaintiff to fall forward toward Whelan

8. Officer Whelan hooked her right arm around Plaintiff's neck while Officer Gallagher, using both hands on Plaintiff's back, forced her body forward. Officers Mendez and Mahoney simultaneously grabbed Plaintiff's left arm and hand, forcing her body toward the ground despite plaintiff's lack of violent demeanor.

9. At no point during this sequence did Plaintiff act violent, resist the officers, or pose any threat to the officers or any other person.

10. During the course of the takedown, while Plaintiff was being forced to the ground and physically restrained, Officer Mendez stated, "Fuck you" and "There'll be no more fucking walking," and then deliberately and maliciously twisted Plaintiff's right ankle beyond its natural range of motion in the opposite direction for an extended period of time, evidencing a deliberate intent to cause injury and inflict pain beyond any legitimate law enforcement purpose. **See Exhibit 1**

11. Plaintiff repeatedly asked the officers what they were doing and requested to be allowed to stand up and secure her dog. These requests were ignored.

12. Plaintiff's minor children were present and witnessed the officers' physical takedown of their mother.

13. The officers refused to review video footage Plaintiff had taken prior to their arrival that would have directly disproven any allegation of a crime.

14. The officers permitted unauthorized individuals into Plaintiff's home and turned over Plaintiff's personal property to Helen Otero without Plaintiff's consent.

15. Following the incident, the officers compelled Plaintiff to be transported to a psychiatric hospital for an involuntary mental health evaluation. Plaintiff was coherent, communicative, and not violent. Her children were uninjured and required no emergency medical services. Plaintiff was released from the hospital the same day, on August 18, 2024.

16. No mobile mental health crisis team services were used by defendant officers' during this incident.

### B. The Retaliatory Felony Charges

1. On August 19, 2024 Plaintiff submitted a FOIL request to Police Clerk of Records, Marissa Rugnetta, for officers BODYCAM footage.

2. Plaintiff received the following quoted response on August 20, 2024 in regard to FOIL request – " Please be advised that documents are unable to be released until completed by the assigned Police Officer and approved by a Sergeant. This process could take 7-10 business days, depending on the officers' schedules."

3. On August 30, 2024, Officer Gallagher signed a felony complaint against Plaintiff in the Town Court of Montgomery, County of Orange, State of New York, charging Plaintiff with: (1) Assault 2nd Degree (PL 120.05(3)); (2) Obstruct Governmental Administration 2nd Degree (PL 195.05); (3) Criminal Obstruction of Breathing or Blood Circulation (PL 121.11(A)); and (4) Acting in a Manner Injurious to a Child Under 17 (PL 260.10(1)).

4. On September 9, 2024 Plaintiff followed up with the Police Clerk of Record about FOIL request at which time she was informed of a warrant being issued for her arrest. Plaintiff turned herself into the Montgomery Police Department promptly for processing.

5. These charges were filed notwithstanding that: (a) the children did not require medical attention on August 18, 2024; (b) Helen Otero, declined to cooperate or file a police report; (c) Officer Gallagher's own bodycam footage documented the absence of any dangerous or threatening conduct by Plaintiff; and (d) Plaintiff's conduct throughout the encounter was not violent.

6. As of March 2026, all charges against Plaintiff were dismissed. Plaintiff made no admission of guilt as part of the settlement. The underlying charges were not proven. The prosecution terminated without a conviction, satisfying the favorable termination element for malicious prosecution. Thompson v. Clark, 596 U.S. 36 (2022).

7. The filing of these felony charges was done with actual malice and without probable cause as no reasonable officer could conclude, based on the facts available at the time, that Plaintiff was committing a crime.

## C. The False Child Protective Services Report and Its Consequences

1. Officer Gallagher filed a report with child protective services concerning Plaintiff. In connection with that report, he falsely characterized Plaintiff as "erratic, irate, and incoherent" during the August 18, 2024 encounter. Documents provided in discovery.

2. The characterization of Plaintiff as "erratic, irate, and incoherent" was materially false. Bodycam footage from August 18, 2024 encounter documents Plaintiff's actual conduct throughout the incident. Plaintiff was coherent, communicative, and not violent. The officer's false characterization was made knowingly and without factual basis.

3.  As a result of the false CPS report, Plaintiff was indicated by child protective services. An indicated CPS finding carries serious legal consequences, including its use as evidence in family court proceedings affecting custody and visitation. Plaintiff is currently appealing the indicated CPS finding causing direct and measurable harm to Plaintiff's reputation as a parent and person.

## FIRST CAUSE OF ACTION

### Discrimination based on disability or perceived disability

### Title II of the American with Disabilities Act

### 42 U.S.C 12131, et seq.

*(Against all Defendants')*

1.  Plaintiff realledge and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

2.  Title II of the Americans with Disabilities Act states "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

3.  Defendants' denied the benefits of services, programs, and/or activities to which plaintiff is entitled too including but not limited to the right to be free of discriminatory or disparate treatment by virtue of plaintiff's mental disability or perceived mental disability. As a result, Plaintiff suffered harm in violation of plaintiff's rights under ADA 42 U.S.C 12132.

## SECOND CAUSE OF ACTION

### Violation of Title III of the ADA, 42 U.S.C. 12181, et seq.,

### And Section 504 of the Rehabilitation Act, 29 U.S.C. 794

*(Against all Defendants')*

1. Plaintiff realledge and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

2. Under 42 U.S.C. 12182, Defendants' are prohibited from discriminating against an individual on the basis of disability in the full and equal enjoyment of privileges, advantages, services or accommodations.

3. Under 29 U.S.C. 794 Defendants may not exclude or discriminate against a qualified individual solely by reason of their disability.

4. Defendants' acted with deliberate indifference to Plaintiff's federally protected rights, resulting in discriminatory disparate treatment and harm to the Plaintiff. As a result of Defendants' discriminatory acts, Plaintiff has been harmed and is entitled to damaged including but not limited to injunctive and compensatory damages.

## THIRD CAUSE OF ACTION

### Unlawful Seizures in Violation of the Fourth and Fourteenth Amendments

*(Against all Defendants')*

1. Plaintiff realledge and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

2. All Defendants' were acting "under the color of statue" – specifically but not limited to New York Mental Hygiene Law 9.41. These statues granted the Defendants legal authority to bypass Plaintiff's lack of consent, and/or forcibly seize her, and/or forcibly transport her, and/or forcibly have her evaluated.

3. All Defendants' seizure of Plaintiff was unreasonable, without probable cause, and done without lawful justification.

## **FOURTH CAUSE OF ACTION**

### **Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments**

### *(Against all Dependents')*

1. Plaintiff realledge and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

2. A government official who knowingly provides false information that is used to initiate legal proceedings against an individual violates that individual's Fourth and Fourteenth Amendment due process rights.

3. On August 24, 2024, Officer Mendez obtained a police report from Jennifer Stafford while she was hospitalized for unknown reasons, under the influence of medication, and he knew or should have known that she was providing information not stated on the day of the incident and/or exaggerated and/or with malice toward the Plaintiff.

4. Defendants' acted with deliberate indifference to Plaintiff's federally protected rights, resulting in discriminatory disparate treatment and harm to the Plaintiff.

5. Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, as their actions violated both the law and/or their own rules of practice and/or their own policy manuals and/or basic principles of good ethics and morale.

## FIFTH CAUSE OF ACTION

### Interference with Parental Rights in Violation of the Fourteenth Amendment

*(All Defendents')*

1. Plaintiff realledge and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

2. On September 4, 2024, Officer Gallagher provided materially false information to child protective services by characterizing Plaintiff as "erratic, irate, and incoherent," and a danger to her children during the August 18, 2024 encounter.

3. Plaintiff retains a constitutionally protected liberty interest in raising her children including but not limited to the right to exercise reasonable and lawful discipline, free from unwarranted government interference.

4. The children's moral and emotional wellbeing was directly and adversely affected by witnessing officers use force against Plaintiff while she was engaged in the lawful, non-physical correction of her son's behavior during court-ordered parenting time.

5. Defendants' Town of Montgomery and Defendant Officers' interfered with Plaintiff's fundamental parental rights through a series of interconnected unlawful acts including but not limited to: (a) entering her home and using force against her during court-ordered parenting time; and/or (b) removing her from her children's presence through an unjustified involuntary psychiatric commitment; and/or (c) initiating felony charges that resulted in a court-ordered stay away order restricting Plaintiff's parental relationship; and/or (d) filing a false CPS report that resulted in an indicated finding currently being used against Plaintiff in family court.

6. The harm to Plaintiff's parental rights is not speculative - it is concrete, documented, and ongoing.

7. Defendants' acted with deliberate indifference to Plaintiff's federally protected rights, resulting in discriminatory disparate treatment and harm to the Plaintiff.

8. Furthermore, all Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, as their actions violated both the law and/or their own rules of practice and/or their own policy manuals and/or basic principles of good ethics and morale.

## SIXTH CAUSE OF ACTION

### The First Amendment (Free Exercise Clause)

(Against all Defendants')

1. Plaintiff realledge and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

2. Plaintiff voiced concerns about Officers' conduct and actions.

3. Defendants' Town of Montgomery/Town of Montgomery Police Dept. officers' retaliated against Plaintiff for exercise of her protected speech through a coordinated series of adverse actions including but not limited to: (a) forcibly entering her home; (b) using excessive force against her; (c) compelling her involuntary psychiatric commitment; (d) causing felony charges to be filed against her without probable cause; and (e) filing or causing to be filed a false CPS report characterizing Plaintiff as "erratic, irate, and incoherent," and as a danger to her children.

## SEVENTH CAUSE OF ACTION

### FAILURE TO INTERVENE

*( Against all Defendents')*

1. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

2. Each Defendant who was present during but not limited to the following events: the warrantless entry, and/or unlawful detention, and/or use of excessive force, and/or initiation of malicious criminal charges, and/or initiation of malicious child abuse/maltreatment report, and/or involuntary psychiatric evaluation had a realistic opportunity to intervene to prevent the constitutional violations committed by the other Defendants.

3. Each Defendant failed to intervene despite having the opportunity to do so, rendering each individually liable for all constitutional violations that occurred.

## EIGTH CAUSE OF ACTION

## MONELL CLAIM: MUNICIPAL LIABILITY

*(Against the Town of Montgomery)*

1. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

2. A municipality is liable under 42 U.S.C. § 1983 where a plaintiff's constitutional deprivation was caused by a policy, custom, or practice of the municipality, or by a failure to train amounting to deliberate indifference to constitutional rights. Monell v. Dep't of Social Services, 436 U.S. 658 (1978).

3. The Town of Montgomery, through its Police Department, maintained policies, customs, and practices that directly caused Plaintiff's constitutional injuries, including, but not limited to: (a) a practice and/or custom of responding to mental wellness calls by compelling involuntary psychiatric evaluations without an individualized assessment of actual dangerousness; (b) a practice and/or custom of disregarding individuals' protected

rights; (c) a failure to follow protocols regarding individuals with a disability and/or perceived disability; (d) a failure to train officers in the appropriate handling of individuals with mental health disabilities.

4. The Town of Montgomery had actual or constructive notice of this pattern through encounters involving the chief, same officers, same caller(s), and the same pretextual justifications, and failed to take any corrective action, demonstrating deliberate indifference to Plaintiff's constitutional rights.

## NINTH CAUSE OF ACTION

## VIOLATIONS OF NINTH AMENDMENT – RIGHTS RETAINED BY THE PEOPLE

1. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

2. The Ninth Amendment provides that the enumeration of certain rights in the Constitution shall not be construed to deny or disparage others retained by the people.

3. Defendants' acted under color of state law to intrude upon, restrict, and deprive Plaintiff of fundamental liberties retained by the people, including but not limited to, personal autonomy, bodily integrity, family integrity, and freedom from discrimination or disparage treatment.

4. To the extent any of Plaintiff's rights violated by Defendants' conduct are not fully captured by the enumerated constitutional provisions asserted in this complaint, those rights are among those retained by the people under the Ninth Amendment, and Defendants' actions constituted a violation thereof actionable under 42 U.S.C. 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Gloria Luciano respectfully requests that this Court:

a. Award Plaintiff compensatory damages for all economic and non-economic harm caused by Defendants' conduct, including but not limited to, past and future lost income, pain and suffering, emotional distress, mental anguish and loss of enjoyment of life, in amounts to be determined at trial as fair and reasonable;

b. Award Plaintiff punitive damages against the individual Defendants in an amount to be determined at trial as fair and reasonable, to punish Defendants' willful and malicious conduct and to deter similar acts in the future;

c. Award Plaintiff reasonable attorneys' fees, expert witness fees, and litigation costs pursuant to 42 U.S.C. § 1988 and other applicable law;

d. Grant such other and further relief as this Court may deem just and proper.

DATED: APRIL 01, 2026

By: _____

GLORIA LUCIANO, *PRO SE*

PLAINTIFF

202 St. Andrews Road

Apt. 1

Walden, New York 12586

(845) 636-0622

Glorialuciano4@gmail.com

TO: JUDITH B. AUMAND, ESQ.

Bar Roll No.: 515936

Attorneys for Defendants

7 Washington Square

P.O. Box 15085

Albany, New York 12212-5085